**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI-DADE DIVISION**

**GLORIA DUGAN,**

      *Plaintiff,*                       **Case No.:** _____

**vs.**                              **COMPLAINT & JURY DEMAND**

**JANSSEN RESEARCH &**
**DEVELOPMENT (f/k/a "Johnson**
**and Johnson Pharmaceutical**
**Research and Development LLC");**

**JANSSEN ORTHO LLC;**

**JANSSEN PHARMACEUTICALS,**
**INC. (f/k/a "Janssen**
**Pharmaceutical Inc.," (f/k/a**
**"Ortho-McNeil-Janssen**
**Pharmaceuticals, Inc."));**

**BAYER HEALTHCARE**
**PHARMACEUTICALS, INC.;**

**BAYER PHARMA AG;**

**BAYER CORPORATION;**

**BAYER HEALTHCARE LLC;**

**BAYER HEALTHCARE AG; and,**

**BAYER AG,**

      *Defendants.*
_____/

## **COMPLAINT**

COMES NOW, Plaintiff GLORIA DUGAN, by and through undersigned counsel, against the above-named Defendants, jointly and severally, and hereby specifically alleges the following causes of action; and so further states as follows:

1

**JURISDICTION AND VENUE**

1.     Plaintiff brings this action pursuant to Title 28 United States Code Section 1332 (28 U.S.C. § 1332), because the amount in controversy as to the Plaintiff exceeds $75,000.00 exclusive of interest and costs, and because there is complete diversity of citizenship between the Plaintiff and the Defendants.

2.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2), because a "substantial part of the events or omissions giving rise to the claim occurred" in the Southern District of Florida, namely Fort Pierce, Florida.

3.     This Court has personal jurisdiction over the parties, pursuant to Florida Statute Title VI, Chapter 48, Section 193 (FS § 48.193), because the Defendants operated, conducted, engaged in, or carried on a business venture in the State of Florida by advertising, promoting, marketing, selling, and distributing Xarelto, to be prescribed in the Southern District of Florida, directly and indirectly advertising, promoting, marketing, selling, and distributing Xarelto into the stream of commerce in the State of Florida and resulting in the tortious conduct, injury, and damages hereinafter alleged in this Complaint.

**NATURE OF THE CASE**

4.     This action is brought on behalf of GLORIA DUGAN, (hereinafter "Plaintiff"). Plaintiff was prescribed Xarelto also known as rivaroxaban to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat venous thromboembolism (hereinafter "VTE") including deep vein thrombosis (hereinafter referred to as "DVT") and pulmonary embolism (hereinafter referred to as "PE"), to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT.

2

Specifically, Plaintiff was prescribed Xarelto for the purpose of treating a venous thromboembolism, taking the medication as prescribed, and as intended by Defendants.

5. Defendants, JANSSEN RESEARCH & DEVELOPMENT LLC (f/k/a JOHNSON AND JOHNSON PHARMACEUTICAL RESEARCH ANDDEVELOPMENT LLC), JANSSEN ORTHO LLC, JANSSEN PHARMACEUTICALS, INC. (f/k/a "JANSSEN PHARMACEUTICA INC."; f/k/a "ORTHO-MCNEIL-JANSSENPHARMACEUTICALS, INC."), BAYER HEALTHCARE PHARMACEUTICALS, INC., BAYER PHARMA AG, BAYER CORPORATION, BAYER HEALTHCARE LLC,BAYER HEALTHCARE AG, and BAYER AG (hereinafter collectively referred to as "Defendants") designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed Xarelto.

6. When warning of safety and risks of Xarelto, Defendants negligently and/or fraudulently represented to the medical and healthcare community, the Food and Drug Administration (hereinafter referred to as the "FDA"), to Plaintiff and the public in general, that Xarelto had been tested and was found to be safe and/or effective for its indicated use.

7. Defendants concealed their knowledge of Xarelto's defects and the risks of serious side-effects from Plaintiff, the FDA, the public in general and/or the medical community specifically, failing to include the risks of serious adverse skin reactions.

8. These representations were made by Defendants with the intent of defrauding and deceiving Plaintiff, the public in general, and the medical and healthcare community in particular, and were made with the intent of inducing the public in general, and the medical community in particular, to recommend, dispense and/or purchase Xarelto for use to reduce the risk of stroke and systemic embolism in patients

3

with nonvalvular atrial fibrillation, to treat VTE, including DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT, all of which evinced a callous, reckless, willful, wanton, depraved indifference to health, safety and welfare of the Plaintiff herein.

9.      Defendants negligently and improperly failed to perform sufficient tests using Xarelto during clinical trials, forcing Plaintiff, and Plaintiff's physicians, hospitals, and/or the FDA, to rely on safety information that applies to other non-valvular atrial fibrillation treatment and VTE/DVT/PE treatment and prophylaxis, which does not entirely and/or necessarily apply to Xarelto whatsoever.

10.      The clinical trials and/or studies that Defendants have performed showed a greater likelihood of severe adverse skin reactions in patients on Xarelto, than patients on other forms of treatment for VTE, DVT, and PE. Defendants have ignored growing evidence of adverse reactions to Xarelto in clinical trials, case reports, and medical journals.

11.      As a result of the foregoing acts and omissions, the Plaintiff was caused to suffer serious and dangerous side-effects including, inter alia, severe adverse skin reactions, such as blistering, lesions, and necrosis, as well as other severe and personal injuries including disfigurement, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life. Plaintiff herein has sustained certain of the above health consequences due to Plaintiff's use of Xarelto.

12.      Defendants concealed their knowledge of the defects in their products from the Plaintiff, and Plaintiff's physicians, hospitals, pharmacists, the FDA, and the public in general.

13.     Consequently, Plaintiff seeks compensatory damages as a result of Plaintiff's use of the Xarelto, which has caused Plaintiff to suffer from an adverse reaction including blisters, lesions, and necrosis, as well as other severe and personal injuries including disfigurement, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

### PARTY PLAINTIFF

14.     Plaintiff at all times relevant hereto, is a citizen and resident of the State of Florida, who, upon information and belief, suffered personal injuries and disfigurement, as a direct result of Plaintiff's use of Xarelto.

15.     Upon information and belief, Plaintiff was prescribed Xarelto in the State of Florida, on or around September 2021, for a period of eight (8) days, upon direction of Plaintiff's physician for the treatment of a superficial venous thrombosis of the greater saphenous vein and thrombosed varices in the distal thigh.

16.     Upon information and belief, as a direct and proximate result of the use of Defendants' Xarelto, Plaintiff experienced a serious, dangerous adverse reaction or side-effect, blistering, lesions and severe necrosis in both legs requiring four separate emergency treatments of debridement, leading to disfigurement.

17.     As a direct and proximate result of the use of Defendants' Xarelto, the Plaintiff suffered serious and dangerous side-effects turning to necrotic lesions as well as other severe and personal injuries, permanent and lasting in nature, severe pain, suffering, mental anguish, including, but not limited to, diminished enjoyment of life, expenses for hospitalization and medical treatment, economic and non-economic damages.

18.     As a direct and proximate result of Defendants' conduct, Plaintiff has suffered, incurred injuries, damages, including medical expenses and other economic and non-economic damages.

## PARTY DEFENDANTS

19.     Upon information and belief, Defendant JANSSEN RESEARCH & DEVELOPMENT LLC f/k/a JOHNSON AND JOHNSON RESEARCH AND DEVELOPMENT LLC (hereinafter referred to as "JANSSEN R&D") is a limited liability company organized under the laws of New Jersey, with a principal place of business at One Johnson & Johnson Plaza, New Brunswick, Middlesex County, New Jersey 08933. Defendant JANSSEN R&D's sole member is Janssen Pharmaceuticals, Inc., which is a Pennsylvania corporation with a principal place of business at 1125 Trenton-Harbourton Road, Titusville, New Jersey 08560. Accordingly, JANSSEN R&D is a citizen of Pennsylvania and New Jersey for purposes of determining diversity under 28 U.S.C. § 1332. Defendant JANSSEN R&D is the holder of the approved New Drug Application ("NDA") for Xarelto as well as the supplemental NDA.

20.     As part of its business, JANSSEN R&D is involved in the research, development, sales, and marketing of pharmaceutical products including Xarelto and rivaroxaban.

21.     Upon information and belief, Defendant JANSSEN R&D has transacted and conducted business in the State of Florida.

22.     Upon information and belief, Defendant JANSSEN R&D has derived substantial revenue from goods and products used in the State of Florida.

23.     Upon information and belief, Defendant, JANSSEN R&D, expected or should have expected its acts to have consequence within the United States of America

and the State of Florida, and derived substantial revenue from interstate commerce within the United States and the State of Florida, more particularly.

24.     Upon information and belief, and at all relevant times, Defendant, JANSSEN R&D, was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with nonvalvular atrial fibrillation, to treat VTE including DVT and PE, to reduce the risk of recurrence of VTE, and DVT and/or PE, and for prophylaxis of DVT.

25.     Upon information and belief, Defendant JANSSEN PHARMACEUTICALS, INC. f/k/a JANSSEN PHARMACEUTICA INC. f/k/a ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. (hereinafter referred to as "JANSSEN PHARM") is a Pennsylvania corporation, having a principal place of business at 1125 Trenton-Harbourton Road, Titusville, New Jersey 08560.

26.     As part of its business, JANSSEN PHARM is involved in the research, development, sales, and marketing of pharmaceutical products including Xarelto and Rivaroxaban.

27.     Upon information and belief, Defendant, JANSSEN PHARM has transacted and conducted business in the State of Florida.

28.     Upon information and belief, Defendant, JANSSEN PHARM, has derived substantial revenue from goods and products used in the State of Florida.

29.     Upon information and belief, Defendant, JANSSEN PHARM, expected or should have expected its acts to have consequence within the United States of America

and the State of Florida, and derived substantial revenue from interstate commerce within the United States and the State of Florida, more particularly.

30.     Upon information and belief, and at all relevant times, Defendant, JANSSEN PHARM, was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with nonvalvular atrial fibrillation, to treat VTE including DVT and PE, to reduce the risk of recurrence of VTE, DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

31.     Upon information and belief, Defendant JANSSEN ORTHO LLC (hereinafter referred to as "JANSSEN ORTHO") is a limited liability company organized under the laws of Delaware, having a principal place of business at Stateroad 933 Km 0 1, Street Statero, Gurabo, Puerto Rico 00778. Defendant JANSSEN ORTHO is a subsidiary of Johnson & Johnson. Defendant JANSSEN ORTHO's sole member is OMJ PR Holdings, which is incorporated in Ireland with a principal place of business in Puerto Rico. Accordingly, JANSSEN ORTHO is a citizen of Delaware, Ireland, and Puerto Rico for purposes of determining diversity under 28 U.S.C. § 1332.

32.     As part of its business, JANSSEN ORTHO is involved in the research, development, sales, and marketing of pharmaceutical products including Xarelto and Rivaroxaban.

33.     Upon information and belief, Defendant, JANSSEN ORTHO has transacted and conducted business in the State of Florida.

34.     Upon information and belief, Defendant, JANSSEN ORTHO, has derived substantial revenue from goods and products used in the State of Florida.

8

35. Upon information and belief, Defendant, JANSSEN ORTHO, expected or should have expected its acts to have consequence within the United States of America and the State of Florida, and derived substantial revenue from interstate commerce within the United States and the State of Florida, more particularly.

36. Upon information and belief, and at all relevant times, Defendant, JANSSEN ORTHO, was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat VTE including DVT and PE, to reduce the risk of recurrence of VTE, DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

37. Upon information and belief, Defendant BAYER HEALTHCARE PHARMACEUTICALS, INC. is, and at all relevant times was, a corporation organized under the laws of the State of Delaware, with its principal place of business in the State of New Jersey.

38. Defendant BAYER HEALTHCARE PHARMACEUTICALS, INC. was formerly known as Berlex Laboratories, Inc., which was formerly known as Berlex, Inc. and BAYER HEALTHCARE PHARMACEUTICALS, INC. is the same corporate entity as Berlex, Inc. and Berlex Laboratories, Inc.

39. As part of its business, BAYER HEALTHCARE PHARMACEUTICALS, INC. is involved in the research, development, sales, and marketing of pharmaceutical products including Xarelto and rivaroxaban.

40.     Upon information and belief, Defendant, BAYER HEALTHCARE PHARMACEUTICALS, INC., has transacted and conducted business in the State of Florida.

41.     Upon information and belief, Defendant, BAYER HEALTHCARE PHARMACEUTICALS, INC., has derived substantial revenue from goods and products used in the State of Florida.

42.     Upon information and belief, Defendant, BAYER HEALTHCARE PHARMACEUTICALS, INC., expected or should have expected its acts to have consequence within the United States of America and the State of Florida, and derived substantial revenue from interstate commerce within the United States and the State of Florida, more particularly.

43.     Upon information and belief, and at all relevant times, Defendant, BAYER HEALTHCARE PHARMACEUTICALS, INC., was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat VTE including DVT and PE, to reduce the risk of recurrence of VTE, DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

44.     Upon information and belief, Defendant BAYER PHARMA AG is a pharmaceutical company domiciled in Germany.

45.     Defendant BAYER PHARMA AG is formerly known as Bayer Schering Pharma AG and is the same corporate entity as Bayer Schering Pharma AG. Bayer

Schering Pharma AG is formerly known as Schering AG and is the same corporate entity as Schering AG.

46.   Upon information and belief, Schering AG was renamed Bayer Schering Pharma AG effective December 29, 2006.

47.   Upon information and belief, Bayer Schering Pharma AG was renamed BAYER PHARMA AG effective July 1, 2011.

48.   As part of its business, BAYER PHARMA AG is involved in the research, development, sales, and marketing of pharmaceutical products including Xarelto and rivaroxaban.

49.   Upon information and belief, Defendant, BAYER PHARMA AG, has transacted and conducted business in the State of Florida.

50.   Upon information and belief, Defendant, BAYER PHARMA AG, has derived substantial revenue from goods and products used in the State of Florida.

51.   Upon information and belief, Defendant, BAYER PHARMA AG, expected or should have expected its acts to have consequence within the United States of America and the State of Florida, and derived substantial revenue from interstate commerce within the United States and the State of Florida, more particularly.

52.   Upon information and belief, and at all relevant times, Defendant, BAYER PHARMA AG, was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat and prevent DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

53. Upon information and belief, Defendant BAYER CORPORATION is an Indiana corporation with its principal place of business at 100 Bayer Road, Pittsburgh, Pennsylvania 15205.

54. Upon information and belief, Defendant BAYER CORPORATION is the sole member of BAYER HEALTHCARE LLC, which owns 100% of Schering Berlin, Inc., which owns 100% of Defendant BAYER HEALTHCARE PHARMACEUTICALS, INC. As such, Defendant BAYER CORPORATION is a parent of Defendant BAYER HEALTHCARE PHARMACEUTICALS, INC.

55. At relevant times, Defendant BAYER CORPORATION was engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing into interstate commerce, either directly or indirectly through third parties or related entities, its products, including the prescription drug Xarelto.

56. At relevant times, Defendant BAYER CORPORATION conducted regular and sustained business in the State of Florida, by selling and distributing its products in the State of Florida and engaged in substantial commerce and business activity in the State of Florida.

57. Upon information and belief, Defendant BAYER HEALTHCARE LLC is a limited liability company duly formed and existing under and by the virtue of the laws of the State of Delaware, with its principal place of business located in the State of New Jersey. BAYER HEALTHCARE LLC's sole member is Bayer Corporation, and is wholly owned by Bayer Corporation, which is an Indiana corporation with its principal place of business at 100 Bayer Road, Pittsburgh, Pennsylvania 15205. Accordingly, BAYER

12

HEALTHCARE LLC is a citizen of Delaware, New Jersey, Indiana and Pennsylvania for purposes of determining diversity under 28 U.S.C. § 1332.

58. Upon information and belief, at all relevant times, Defendant BAYER HEALTHCARE LLC has transacted and conducted business in the State of Florida, and derived substantial revenue from interstate commerce. Defendant BAYER CORPORATION is the sole member of Defendant BAYER HEALTHCARE LLC.

59. Upon information and belief, at all relevant times, Defendant BAYER HEALTHCARE LLC expected or should have expected that its acts would have consequences within the United States of America and in the State of Florida, and derived substantial revenue from interstate commerce.

60. Upon information and belief, at all relevant times, Defendant BAYER HEALTHCARE LLC was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat VTE including DVT and PE to reduce the risk of recurrence of VTE, DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

61. Upon information and belief, Defendant BAYER HEALTHCARE AG is a company domiciled in Germany and is the parent/holding company of Defendants BAYER CORPORATION, BAYER HEALTHCARE LLC, BAYER HEALTHCARE PHARMACEUTICALS, INC, and BAYER PHARMA AG.

62. Upon information and belief, at all relevant times, Defendant BAYER HEALTHCARE AG has transacted and conducted business in the State of Florida, and derived substantial revenue from interstate commerce.

63.     Upon information and belief, at all relevant times, Defendant BAYER HEALTHCARE AG expected or should have expected that its acts would have consequences within the United States of America, and in the State of Florida, and derived substantial revenue from interstate commerce.

64.     Upon information and belief, at all relevant times, Defendant BAYER HEALTHCARE AG exercises dominion and control over Defendants BAYER CORPORATION, BAYER HEALTHCARE LLC, BAYER HEALTHCARE PHARMACEUTICALS, INC., and BAYER PHARMA AG.

65.     Upon information and belief, Defendant BAYER AG is a German chemical and pharmaceutical company that is headquartered in Leverkusen, North Rhine-Westphalia, Germany.

66.     Upon information and belief, Defendant BAYER AG is the third largest pharmaceutical company in the world.

67.     Upon information and belief, and at all relevant times Defendant BAYER AG is the parent/holding company of all other named Defendants.

68.     Upon information and belief, at all relevant times, Defendant BAYER AG has transacted and conducted business in the State of Florida, and derived substantial revenue from interstate commerce.

69.     Upon information and belief, at all relevant times, Defendant BAYER AG expected or should have expected that its acts would have consequences within the United States of America, and in the State of Florida, and derived substantial revenue from interstate commerce.

70.     Upon information and belief, at all relevant times, Defendant BAYER AG was in the business of and did design, research, manufacture, test, advertise, promote,

14

market, sell, and distribute Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with nonvalvular atrial fibrillation, to treat VTE, including DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

## GENERAL FACTUAL BACKGROUND

71.    At all relevant times, Defendants were in the business of and did design, research, manufacture, test, advertise, promote, market, sell and distribute Xarelto and rivaroxaban to reduce the risk of stroke and systemic embolism in patients with nonvalvular atrial fibrillation, to treat VTE, including DVT and PE, to reduce the risk of recurrence of VTE, DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

72.    Xarelto is an anticoagulant that acts as a Factor Xa inhibitor and is available by prescription in oral tablet doses of 20mg, 15mg, and 10mg.

73.    Defendants received FDA approval for Xarelto, also known as rivaroxaban, on July 1, 2011, for the prophylaxis of DVT and PE in patients undergoing hip replacement or knee replacement surgeries (NDA 022406).

74.    Defendants then received additional FDA approval for Xarelto to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation on November 4, 2011 (NDA 202439).

75.    On October 30, 2017, Janssen Pharmaceuticals, Inc., announced the FDA approved the 10 mg once-daily dose of Xarelto (rivaroxaban) for reducing the continued risk for recurrent venous thromboembolism (VTE) after completing at least six months of initial anticoagulation therapy.

15

76. The approval followed an FDA Priority Review based on data from the clinical study EINSTEIN CHOICE.

77. The additional indication for treatment of DVT and/or PE and the reduction in recurrence of DVT and/or PE was added to the label on November 2, 2012.

78. Defendants launched Xarelto in the United States (hereinafter referred to as the "U.S.") in 2011.

79. Approval of Xarelto for the prophylaxis of DVT and PE in patients undergoing hip replacement or knee replacement surgeries was based on a series of clinical trials known as the Regulation of Coagulation in Orthopedic Surgery to Prevent Deep Venous Thrombosis and Pulmonary Embolism studies (hereinafter the "RECORD" studies).

80. The findings of the RECORD studies showed that rivaroxaban was superior to enoxaparin for thromboprophylaxis after total knee and hip arthroplasty (based on the Defendants' definition), accompanied by similar rates of bleeding. However, the studies also showed a greater incidence with Xarelto of bleeding leading to decreased hemoglobin levels and transfusion of blood.[1]

81. Approval of Xarelto for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation in the U.S. was based on a clinical trial known as the *Rivaroxaban Once Daily Oral Direct Factor Xa Inhibition Compared*

---

[1] Lassen, M.R., et al. *Rivaroxaban versus Enoxaparin for Thromboprophylaxis after Total Knee Arthroplasty.* 358 N.Engl.J.Med. 2776-86 (2008); Kakkar, A.K., et al. *Extended duration rivaroxaban versus short-term enoxaparin for the prevention of venous thromboembolism after total hip arthroplasty: a double-blind, randomised controlled trial,* Lancet 372:31-39 (2008); Ericksson, B.I., et al. *Rivaroxaban versus Enoxaparin for Thromboprophylaxis after Hip Arthroplasty,* 358 N.Engl.J.Med., 2765-75 (2008)

*with Vitamin K Antagonism for Prevention of Stroke and Embolism Trial in Atrial Fibrillation* study (hereinafter the "ROCKET AF" study).

82.    The ROCKET AF study's findings showed that rivaroxaban was noninferior to warfarin for the prevention of stroke or systemic embolism in patients with non-valvular atrial fibrillation, with a similar risk of major bleeding. However, "bleeding from gastrointestinal sites, including upper, lower, and rectal sites, occurred more frequently in the rivaroxaban group, as did bleeding that led to a drop in the hemoglobin level or bleeding that required transfusion."[2]

83.    Approval of Xarelto for the treatment of DVT and/or PE and the reduction in recurrence of DVT and/or PE in the U.S. was based on the clinical trials known as the EINSTEIN-DVT, EINSTEIN-PE, and EINSTEIN-Extension studies.

84.    The EINSTEIN DVT study tested Xarelto versus a placebo and merely determined that Xarelto offered an option for treatment of DVT, with obvious increased risk of bleeding events as compared to placebo.[3]

85.    The EINSTEIN Extension study confirmed that result.[4]

86.    The EINSTEIN-PE study's findings showed that a rivaroxaban regimen was non-inferior to the standard therapy for initial and long-term treatment of PE.

---

[2] Patel, M.R., et al. *Rivaroxaban versus Warfarin in Nonvalvular Atrial Fibrillation*. 365 N.Engl.J.Med., 883-91 (2011).

[3] The EINSTEIN Investigators. *Oral Rivaroxaban for Symptomatic Venous Thromboembolism*. 363 N.Engl.J.Med., 2499-510 2010.

[4] Roumualdi, E., et al. *Oral rivaroxaban after symptomatic venous thromboembolism: the continued treatment study (EINSTEIN Extension study)*. Expert Rev. Cardiovasc. Ther. 2011;9(7):841-844.

87.    **However, the studies also demonstrated an increased risk of adverse events with Xarelto, including those that resulted in permanent discontinuation of Xarelto or prolonged hospitalization.[5]**

88.    Case Reports and medical journals show the more public adverse reactions of bleeding from Xarelto have caused severe skin reactions to have been overlooked, "[d]ue to the mechanism of action of rivaroxaban, much consideration has been given to hemorrhage-related adverse effects; thus, non-hemorrhage adverse effects receive less attention and some of them go unrecognized."[6]

89.    However, Case Reports show the direct causal link between Xarelto and the injury termed Rivorobaxon-Induced Skin Necrosis (RISN).[7]

90.    An article in the CURRENT PHARMACEUTICAL DESIGN discusses the fact that the percentages (reflecting serious adverse events as rare) are misleading because the fact that anticoagulants are amongst the most widely used drugs means, the serious and life-threatening adverse effects including necrosis have a "considerable impact on patient safety and treatment."[8]

91.    The Article asserts that "immediate diagnosis of potentially life-threatening adverse events and identification of alternatives is necessary."[9]

92.    The RECORD study and the EINSTEIN PE study both showed an increased risk of adverse reactions, such as blistering or pruritus in patients on Xarelto.

---

[5] The EINSTEIN-PE Investigators. *Oral Rivaroxaban for the Treatment of Symptomatic Pulmonary Embolism.* 366 N.Engl.J.Med. 1287-97 (2012).

[6] Mosaad Soliman, et al., *Rivaroxaban-Induced Skin Necrosis: A Case Report.*, 3(3) European Journal of Medical Case Reports, 112-15, (Dec. 2019).

[7] Mosaad Soliman, et al., at 112-15, (Dec. 2019).

[8] Katherine Scherer, et. al., *Hypersensitivity Reactions in Anticoagulant Drugs*, 17;27 Curr. Pharm. Des. 2863-73 (2008).

[9] Katherine Scherer, et. al., at 2863-73 (2008).

a.      The RECORD 1-3 studies showed patients on 10mg of Xarelto had adverse reactions in the form of blisters at a rate of 1.4% versus .9% in patients on Enoxaparin.

b.      The EINSTEIN PE studies showed an adverse reaction of severe pruritus at a rate of 2.2% versus the same type of adverse reactions on Enoxaparin at 1.1%.

93.      The greater risk of adverse skin reactions and evidence showing Xarelto was the direct and/or proximate cause of the adverse reactions, including pruritus, blistering, lesions, necrosis, and disfigurement are documented in case reports, MedWatch reports, and medical journals.[10]

94.      The medical community emphasized the importance of early warning, recognizing the signs of RISN, and reevaluating to prevent further necrosis and disfigurement.

95.      Such Case Reports assert that adverse skin reactions ranging in severity account for one-third of medication-related adverse reactions.[11]

96.      Prior to Plaintiff's prescription of Xarelto, Defendants knew or should have known of the greater risk of adverse skin reactions experienced by patients taking Xarelto, including RISN.

97.      Defendants use the results of the ROCKET AF study, the RECORD studies, and the EINSTEIN studies to promote Xarelto in their promotional materials, including the product-specific website, which touted the positive results of those studies.

---

[10] Mosaad Soliman, et al., at 112-15 (Dec. 2019).
[11] Keyhan Mohammadi, et. al., *Hypersensitivity Reaction to Rivaroxaban with a Successful Switch to Apixaban: A Case Report*, 12;8 Wiley Online Library Clinical Case Reports, https://doi.org/10.1002/ccr3.9213. (Aug. 2024).

98. However, Defendants' promotional materials failed to similarly highlight the increased risk of severe adverse skin reactions including RISN, compared to other medications.

99. Defendants spent significant money in promoting Xarelto, which included at least $11 million spent during 2013, alone, on advertising campaigns that targeted at prescribers **and consumers** in the U.S.

100. In the third quarter of the 2013 fiscal year, Xarelto was the number one pharmaceutical product advertised in professional health journals based on the number of pages featuring ads, and the amount of money spent.

101. As a result of Defendants' aggressive marketing efforts, in its first year on the market, Xarelto garnered approximately $582 million in sales globally.

102. Defendants' product website for Xarelto currently claims that over 80 million people in the US alone have been prescribed Xarelto (up from the 1 million Xarelto prescriptions by the end of 2013).

103. During the Defendants' 2012 fiscal year, Xarelto garnered approximately $658 million in sales worldwide.

104. Then, in 2013, sales for Xarelto increased even further to more than clear the $1 billion threshold, commonly referred to as "blockbuster" status in the pharmaceutical industry, and later reaching approximately $2 billion for the fiscal year.

105. In 2015 Defendants spent $106,000,000.00 on marketing Xarelto, outspending competitors that touted safer options, and Defendants continue to spend millions to recommend Xarelto to prescribing physicians **and the general public** without any mention of Rivorobaxan-Induced Skin Necrosis (RISN) on labeling or

marketing materials; and, Xarelto is **still** considered a leading anticoagulant on a global scale in terms of sales.

106.    As part of their marketing of Xarelto, Defendants widely disseminated **direct-to-consumer** advertising campaigns that were designed to influence patients, including Plaintiff, to make inquiries to their prescribing physician about Xarelto and/or request prescriptions for Xarelto.

107.    In the course of these direct-to-consumer advertisements, Defendants overstated the efficacy of Xarelto with respect to preventing stroke and systemic embolism, while continuing to fail to adequately disclose to patients the heightened and serious risk of adverse reactions including blistering, lesions, and necrosis, termed RISN by case reports in medical journals.

108.    On June 6, 2013, Defendants received an untitled letter from the FDA's Office of Prescription Drug Promotion (hereinafter referred to as the "OPDP") regarding its promotional material for the atrial fibrillation indication, stating that, "the print ad is false or misleading because it minimizes the risks associated with Xarelto and makes a misleading claim" regarding dose adjustments, which was in violation of FDA regulations.

109.    The OPDP thus requested that Defendants immediately cease distribution of such promotional material.

110.    After being previously warned by the FDA about the risks associated with using false or misleading promotional materials and prescription labels that minimize the risks—or, in the case of RISN, omitting the risks entirely—the Defendants continue to use advertisements, promotional materials, and a prescription label that does not

21

warn **prescribing physicians, the general public, or the Plaintiff** about RISN as an adverse reaction to Xarelto or how to recognize the signs of RISN.

111. Prior to Plaintiff's prescription of Xarelto, Plaintiff's physician became aware of the promotional materials described herein which, at all times material, failed to warn of the serious adverse risks of RISN.

112. Prior to Plaintiff's prescription of Xarelto, Plaintiff's prescribing physician received promotional materials and information from sales representatives of Defendants that Xarelto was just as effective as warfarin in reducing strokes and embolism in patients with nonvalvular atrial fibrillation, as well as treating and preventing VTE/DVT/PE in patients with prior history of DVT/PE or undergoing hip or knee replacement surgery; and that it was more convenient, without adequately informing prescribing physicians, or the general public, that there was an increased risk of adverse reactions, including skin blisters, lesions, and necrosis (RISN), such that physicians would recognize the signs of the adverse reaction and react appropriately to prevent exacerbating the reaction.

113. At all times material hereto, Defendants further failed to warn emergency room doctors, surgeons, and other critical care medical professionals that studies showed a greater chance of adverse reactions in patients using Xarelto and to carefully observe patients for signs of adverse skin reactions that turn to blistering, lesions, and necrosis or RISN.

114. At all times material hereto, *The Xarelto Medication Guide*, prepared and distributed by Defendants and intended for U.S. patients to whom Xarelto had been prescribed, failed to warn and disclose to patients that serious and potentially life-threatening adverse skin reactions including blisters, lesions and necrosis can occur and

22

occur often enough for the medical community to have created a term for the specific reaction to Xarelto (rivaroxaban), termed RISN.

115. During the years since first marketing Xarelto in the U.S., Defendants modified the U.S. labeling and prescribing information for Xarelto, which included additional information regarding the use of Xarelto in patients taking certain medications.

116. Despite being aware of serious, adverse reactions associated with the use of Xarelto, Defendants nonetheless failed—and continue failing—to provide adequate disclosures or warnings in their label.

117. Prior to applying for and obtaining approval of Xarelto, Defendants knew or should have known that consumption of Xarelto was associated with and/or would cause adverse skin reactions including blisters and necrosis and Defendants possessed at least one clinical scientific study, which evidence Defendants knew or should have known was a signal that adverse reactions needed further testing and studies prior to its introduction to the market, and should be communicated fully to the public.

118. Upon information and belief, despite an increase in adverse skin reaction findings in clinical trials compared to alternative therapies and other clinical evidence, case reports, medical journals and findings in the medical community, Defendants failed to adequately conduct complete and proper testing of Xarelto.

119. Upon information and belief, from the date Defendants received FDA approval to market Xarelto, Defendants manufactured, distributed, marketed, and sold Xarelto without adequate warning to Plaintiff's prescribing physicians or the general public, including Plaintiff, that Xarelto was associated with and/or could cause adverse reactions, including life-threatening and severe skin blistering, pruritus, lesions, and

23

necrosis and that Defendants had not adequately conducted complete and proper testing and studies of Xarelto with regard to severe side-effects, specifically adverse reactions leading to blisters, lesions, necrosis or more specifically, RISN.

120. Upon information and belief, Defendants concealed, misrepresented, and negligently failed to completely disclose its knowledge that Xarelto was associated with or could cause life-threatening and or otherwise severe adverse skin reactions, including but not limited to blistering, lesions, necrosis, as well as its knowledge that they had failed to fully test, or study said risk.

121. Upon information and belief, Defendants ignored the association between the use of Xarelto and the risk of developing severe adverse skin reactions, particularly blistering, lesions, necrosis, particularly termed RISN leading to disfigurement.

122. Defendants' failure to disclose information that they possessed regarding the failure to adequately test and study Xarelto for risks of adverse skin reactions further rendered warnings for this medication inadequate.

123. By reason of the foregoing acts and omissions, the Plaintiff was caused to suffer from an adverse skin reaction, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, pain and suffering, and severe emotional distress.

124. By reason of the foregoing acts and omissions, Plaintiff has endured and continues to suffer emotional and mental anguish, medical expenses, and other economic and non-economic damages, as a result of the actions and inactions of the Defendants.

24

**COUNT I –**
**STRICT PRODUCTS LIABILITY**
**(Against All Defendants)**

125.     Plaintiff realleges and incorporates Paragraphs 1-124 of this Complaint with the same force and effect as if more fully set forth herein.

126.     At all times herein mentioned, the Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, distributed Xarelto (and/or have recently acquired the Defendants who have designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed), as hereinabove described, which was used by the Plaintiff.

127.     At all times material hereto, Xarelto was expected to and did reach the usual consumers, handlers, and persons coming into contact with said product without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by the Defendants.

128.     At all times material hereto, Xarelto was in an unsafe, defective, and inherently dangerous condition, which was dangerous to users, and, in particular, the Plaintiff here.

129.     At all times material hereto, the Xarelto that was designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants was defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of Xarelto, especially without warning of the risks of RISN.

130.     At all times material hereto, the Xarelto that was designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by

Defendants was defective in design and/or formulation, in that, when it left the hands of the Defendants, manufacturers, and/or suppliers, it was unreasonably dangerous; and it was more dangerous than an ordinary consumer would expect.

131. At all aforementioned times material hereto, the Xarelto was in a defective condition and unsafe, and Defendants knew or had reason to know that said product was defective and unsafe when used in the form and manner as intended by the Defendants.

132. At all times material hereto, Defendants knew, or should have known, that, at all aforementioned times, the Xarelto was in a defective condition, and was and is inherently dangerous and unsafe.

133. At all times material hereto, including the Plaintiff's use of Xarelto, the Xarelto was being used for the purposes and in a manner normally intended, namely to treat a venous thrombosis embolism (VTE) and reduce the risk of stroke and systemic embolism.

134. At all times material hereto, Defendants, with this knowledge, voluntarily designed its Xarelto in a dangerous condition for use by the public, and in particular the Plaintiff.

135. At all times material hereto, Defendants had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

136. At all times material hereto, Defendants created a product unreasonably dangerous for its normal, intended use.

137. At all times material hereto, the Xarelto that was designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by

Defendants was manufactured defectively, in that Xarelto left the hands of Defendants in a defective condition and was unreasonably dangerous to its intended users.

138.   At all times material hereto, the Xarelto that was designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants reached their intended users in the same defective and unreasonably dangerous condition in which the Defendants' Xarelto was manufactured.

139.   At all times material hereto, the Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed a defective product which created an unreasonable risk to the health of consumers and to the Plaintiff in particular; and Defendants are therefore strictly liable for the injuries sustained by the Plaintiff.

140.   The Plaintiff could not, by the exercise of reasonable care, have discovered Xarelto's defects herein mentioned and perceived its danger prior to Plaintiff's use.

141.   At all times material hereto, the Xarelto that was designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants was defective due to inadequate warnings or instructions, as the Defendants knew or should have known that the product created a risk of serious and dangerous side-effects including severe and life-threatening adverse reactions, blisters, lesions, necrosis, and disfigurement as well as other severe and personal injuries which are permanent and lasting in nature and the Defendants failed to adequately warn of said risk.

142.   At all times material hereto, the Xarelto that was designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by

Defendants was and continues to be defective due to inadequate warnings and/or inadequate testing.

143. At all times material hereto, the Xarelto that was designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants was defective due to inadequate post-marketing surveillance and/or warnings because, after Defendants knew or should have known of the risks of serious side-effects including severe and life-threatening adverse skin reactions, as well as other severe and permanent health consequences from Xarelto, they failed to provide adequate warnings to users or consumers of the product, and continued to improperly advertise, market and/or promote their product, Xarelto.

144. At all times material hereto, due to the Defendants failure to include adequate warnings on product labels and other marketing materials, the foreseeable risk of harm to patients experiencing adverse side effects was unreasonably dangerous, especially because the prescribing physicians were not warned of the adverse side-effects of using the product as intended and, as a result of Defendants' misinformation, kept Plaintiff on Xarelto for eight (8) days, causing additional, prolonged necrosis in Plaintiff's legs.

145. By reason of the foregoing, the Defendants are strictly liable in tort to the Plaintiff for the manufacturing, marketing, promoting, distribution, and selling of a defective product, Xarelto, and for their failure to warn the prescribing physicians and the general public, including the Plaintiff, of the aforementioned side-effects including adverse skin reactions, blistering, lesions, necrosis and disfigurement.

146. By reason of the foregoing, the Defendants' defective design, manufacturing defect, and inadequate warnings of Xarelto were acts that amount to

28

callous, willful, wanton, and/or reckless conduct, showing depraved indifference to health and safety.

147. By reason of the foregoing, the defects in Defendants' drug Xarelto were a direct and/or proximate cause of Plaintiff's injuries; and, the Plaintiff would not have had an adverse reaction to the drug "but for" taking the prescription as intended by Defendants.

148. At all times material hereto, the adverse reactions were reasonably foreseeable by Defendants because Defendants knew or should have known of the greater likelihood of adverse skin reactions in patients taking Xarelto and failed to provide adequate warnings of the risks of harm that would have provided notice to prescribing physicians and the Plaintiff.

149. As a direct and proximate result of the foregoing acts and omissions of the Defendants, the Plaintiff suffer serious and life-threatening adverse reactions and side effects to Xarelto, including but not limited to severe and life-threatening adverse skin reactions, blistering, lesions, necrosis and disfigurement, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, and expenses for hospitalization.

150. As a result of the foregoing acts and omissions, Plaintiff has suffered and incurred damages, including medical expenses; and other economic and noneconomic damages related to the future maintenance of Plaintiff's disfigurement.

## COUNT II –
### NEGLIGENCE
**(Against All Defendants)**

151.    Plaintiff restates and incorporates by reference Paragraphs 1-124 of this Complaint with the same force and effect as if more fully set forth herein.

152.    Defendants had a duty to exercise reasonable care in the designing, researching, manufacturing, marketing, supplying, promoting, packaging, sale and/or distribution of Xarelto into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous side effects.

153.    Defendants breached their duty to exercise reasonable care in the designing, researching, manufacturing, marketing, supplying, promoting, packaging, sale and/or distribution of Xarelto into the stream of commerce.

154.    Defendants failed to exercise ordinary care in the designing, researching, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of Xarelto into interstate commerce in that Defendants knew or should have known that using Xarelto created a high risk of unreasonable, dangerous side-effects, including, severe adverse skin reactions, blistering, lesions, necrosis and disfigurement, termed RISN in the medical community, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

155.    The risk of harm was foreseeable in that Defendants knew or should have known of the greater likelihood of adverse skin reactions in patients taking Xarelto.

156.    Defendants failed to adequately warn the medical community, the general public, the prescribing physician, and the Plaintiff.

157.    The Plaintiff suffered an adverse skin reaction beginning within day one (1) of Xarelto treatment for a venous thromboembolism, which turned to blistering, necrotic lesions on both legs requiring four separate emergency sessions of debridement and disfigurement in the eight (8) days of taking Xarelto.

158.    Xarelto is the direct and proximate cause of the adverse skin reaction.

159.    Defendants' failure to adequately warn prescribing physicians, the medical community, general public, and the Plaintiff exacerbated the harm caused by the adverse reaction.

160.    The negligence by JANSSEN, their agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

    a.    Manufacturing, producing, promoting, formulating, creating, and/or designing Xarelto without thoroughly testing it;

    b.    Manufacturing, producing, promoting, formulating, creating, and/or designing Xarelto without adequately testing it;

    c.    Not conducting sufficient testing programs to determine whether or not Xarelto was safe for use; in that Defendants herein knew or should have known that Xarelto was unsafe and unfit for use by reason of the dangers to its users;

    d.    Selling Xarelto without making proper and sufficient tests to determine the dangers to its users;

    e.    Negligently failing to warn adequately and correctly, the Plaintiff, the public, the medical and healthcare profession, and the FDA of the dangers of Xarelto;

f. Failing to provide adequate instructions regarding safety precautions to be observed by users, handlers, and persons who would reasonably and foreseeably come into contact with or prescribe Xarelto, and more particularly, use Xarelto;

g. Failing to test Xarelto and/or failing to adequately, sufficiently, and properly test Xarelto;

h. Negligently advertising, marketing and recommending the use of Xarelto without sufficient knowledge as to its dangerous propensities;

i. Negligently representing that Xarelto was safe for use for its intended, purpose, when, in fact, it was unsafe;

j. Negligently representing that Xarelto had equivalent safety and efficacy as other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, treating VTE and reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients;

k. Negligently designing Xarelto in a manner, which was dangerous to its users;

l. Negligently manufacturing Xarelto in a manner, which was dangerous to its users;

m. Negligently producing Xarelto in a manner, which was dangerous to its users;

n. Negligently assembling Xarelto in a manner, which was dangerous to its users;

o. Concealing information from the Plaintiff's prescribing physicians, Plaintiff, and the general public in knowing that Xarelto was unsafe, dangerous, and/or non-conforming with FDA regulations, or otherwise had an increased risk of causing adverse reactions; and

p. Improperly concealing from and/or misrepresenting information to Plaintiff, healthcare professionals, and/or the FDA, and the general public concerning the severity of risks and dangers of Xarelto compared to other forms of treatment for reducing the risk of stroke and systemic embolism in patients, treating VTE, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients.

q. Negligently failing to warn Plaintiff, prescribing physicians, healthcare professionals, and/or the FDA, as well as the general public for adverse skin reactions resulting from Xarelto which the medical community has termed RISN.

161. As a result of the foregoing acts and omissions, Plaintiff has suffered and incurred damages, including medical expenses; and other economic and noneconomic damages related to the future maintenance of Plaintiff's disfigurement.

## COUNT III –
## BREACH OF EXPRESS WARRANTY
### (Against All Defendants)

162.   Plaintiff restates and incorporates by reference Paragraphs 1-124 of this Complaint with the same force and effect as if more fully set forth herein.

163.   Defendants expressly warranted that Xarelto was safe and well tested through clinical studies clearly delineating the outlined risks of harm to patients stating specific risks that did not include severe adverse skin reactions or RISN.

164.   Xarelto does not conform to these express representations because Xarelto is not safe and has numerous serious side-effects, many of which were not accurately or adequately warned about by Defendants.

165.   Plaintiff did rely on the express warranties of the Defendants herein when Plaintiff was prescribed and paid for Xarelto for use in treatment as intended by the Defendant.

166.   Members of the medical community, including physicians and other healthcare professionals, relied upon the representations and warranties of the Defendants for use of Xarelto in recommending, prescribing, and/or dispensing Xarelto.

167.   The Defendants herein breached the aforesaid express warranties, as their drug Xarelto was defective and directly caused a greater likelihood of serious adverse skin reactions which were not included on the prescription label, or other marketing materials intended for prescribing physicians and the general public.

168.   As a direct and proximate result of the breach of said warranties, Plaintiff suffered and/or will continue to suffer severe and permanent personal injuries, harm and economic loss.

169.     Defendants expressly represented to Plaintiff, Plaintiff's physicians, healthcare providers, and/or the FDA that Xarelto was safe and fit for use for the purposes intended, that it was of merchantable quality, that it did not produce any dangerous side effects in excess of those risks associated with other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT, that the side effects it did produce were accurately reflected in the warnings and that it was adequately tested and fit for its intended use.

170.     Defendants knew or should have known that, in fact, said representations and warranties were false, misleading and untrue in that Xarelto was not safe and fit for the use intended, and, in fact, would produce serious injuries to some users that were not accurately identified and represented by Defendants.

171.     As a result of the forgoing acts and omissions, Plaintiff used Xarelto as it was intended to be used, on the instructions of the Defendants, causing a more severe reaction and exacerbating the injury because Defendants did not warn of the severe adverse skin reactions termed RISN.

172.     As a result of the foregoing acts and omissions, the Plaintiff was caused to suffer serious and dangerous side-effects including severe adverse skin reactions, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, and expenses for hospitalization.

173.     As a result of the foregoing acts and omissions, Plaintiff has suffered and incurred damages, including excruciating pain and suffering, disfigurement, medical expenses, and other economic and non-economic damages.

35

**COUNT IV–**
**BREACH OF IMPLIED WARRANTY**
**(Against All Defendants)**

174.    Plaintiff restates and incorporates by reference Paragraphs 1-124 of this Complaint with the same force and effect as if more fully set forth herein.

175.    At all times herein mentioned, the Defendants manufactured, compounded, portrayed, distributed, recommended, merchandized, advertised, promoted and sold Xarelto and/or have recently acquired the Defendants who have manufactured, compounded, portrayed, distributed, recommended, merchandized, advertised, promoted and sold Xarelto, to reduce the risk of stroke and systemic embolism in patients with nonvalvular atrial fibrillation, to treat VTE, DVT and PE, to reduce the risk of recurrence of VTE, DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

176.    At the time Defendants marketed, sold, and distributed Xarelto for use by Plaintiff, Defendants knew of the use for which Xarelto was intended and impliedly warranted the product to be of merchantable quality and safe and fit for such use.

177.    The Defendants impliedly represented and warranted to the users of Xarelto and their physicians, healthcare providers, and/or the FDA that Xarelto was safe and of merchantable quality and fit for the ordinary purpose for which said product was to be used.

178.    The representations and warranties aforementioned were false, misleading, and inaccurate in that Xarelto was unsafe, unreasonably dangerous, improper, not of merchantable quality, and defective.

179.    Plaintiff, and/or members of the medical community and/or healthcare professionals, did rely on said implied warranty of merchantability and that of fitness for a particular use and purpose.

180.    Plaintiff and Plaintiff's physicians and healthcare professionals reasonably relied upon the skill and judgment of Defendants as to whether Xarelto was of merchantable quality and safe and fit for its intended use.

181.    Xarelto was injected into the stream of commerce by the Defendants in a defective, unsafe, and inherently dangerous condition and the products and materials were expected to and did reach users, handlers, and persons coming into contact with said products without substantial change in the condition in which they were sold.

182.    The Defendants herein breached the aforesaid implied warranties, as their drug Xarelto was not fit for its intended purposes and uses, causing severe adverse side-effects in some of its users.

183.    As a result of the forgoing acts and omissions, the Plaintiff relied on the warranties of Defendants, paid for the prescription of Xarelto and used the medication as Defendants intended it to be used.

184.    As a result of the forgoing acts and omissions, Plaintiff used Xarelto as it was intended to be used, on the instructions of the Defendants, causing a more severe reaction and exacerbating the injury because Defendants did not warn of the severe adverse skin reactions, now termed RISN.

185.    As a result of the foregoing acts and omissions, the Plaintiff was caused to suffer serious and dangerous side-effects including severe adverse skin reactions as well as other severe and personal injuries and disfigurement, which are permanent and

lasting in nature, physical pain and mental anguish, diminished enjoyment of life, expenses for hospitalization.

186. As a result of the foregoing acts and omissions, Plaintiff has suffered and incurred damages, including medical expenses and other economic and noneconomic damages.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff GLORIA DUGAN, by and through undersigned counsel, hereby respectfully requests this Court enter judgment against the Defendants, and each of them, jointly and severally, on each of the above-referenced claims and causes of action, and issue the following relief:

A. Compensatory damages in excess of the jurisdictional amount including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial of this action;

B. Awarding economic damages in the form of medical expenses, out of pocket expense, and other economic damages in an amount to be determined at trial of this action;

C. Punitive and/or exemplary damages for the callous, wanton, willful, reckless acts, and the acts showing a depraved indifference to the health, safety and welfare of the Plaintiff and the general public in an amount sufficient to punish Defendants and deter future similar conduct;

D. Pre-judgment interest;

E. Post-judgment interest;

F. Awarding Plaintiff reasonable attorneys' fees;

G.      Awarding Plaintiff the costs of litigation any legal expenses; and

H.      Such other and further relief as this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

**WHEREFORE**, Plaintiff GLORIA DUGAN, by and through the undersigned

counsel, hereby demands a trial by jury on all issues so triable.

DATED: 09/19/2025                    Respectfully submitted,

**MANN TRIAL ATTORNEYS**

*/s/ Mike Mann*
**MIKE MANN, ESQ.**
Fla. Bar No. 1020249
4300 Bayou Blvd Ste 16
Pensacola, FL 32503
Tel: 850-407-8077
Fax: 850-273-4738
Mike@themann.law
eService@themann.law
*Attorney for Plaintiff.*